# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JASON TODD GAMBLE**
    **Plaintiff,**

    v.                                         Case No. 17-C-0964

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
    **Defendant.**

## DECISION AND ORDER

Plaintiff Jason Gamble seeks judicial review of the denial of his application for social security disability benefits. Plaintiff alleged disability based primarily on a neck impairment, for which he underwent anterior cervical fusion surgery in November 2010. He claimed that, following the surgery, he continued to experience pain and numbness in his right arm and hand, significantly limiting their use. The Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff retained the ability to perform a range of sedentary work, with occasional overhead reaching with the right arm. Plaintiff contends that the ALJ erred in failing to include additional manipulative limitations, erroneously evaluated his statements regarding his symptoms, and failed to give good reasons for discounting the opinion of his treating pain management specialist, Dermot More-O'Ferrall, M.D.[1] I agree that the ALJ failed to adequately consider the issue of manipulative limitations and thus remand for further proceedings.[2]

---

[1] The ALJ and the parties spell the doctor's name "More-O'Farrell," but the treatment notes use the spelling in the text above. (E.g., Tr. at 1322.)

[2] Plaintiff does not argue that the ALJ erred in evaluating his other alleged limitations, including those based on mental impairments, so I largely omit discussion of those issues.

## I.  FACTS AND BACKGROUND

**A.     Plaintiff's Application and Supporting Materials**

Plaintiff applied for supplemental security income benefits on December 7, 2011 (Tr. at 353), alleging that he could no longer work due to a number of physical and mental impairments, including cervical radiculopathy syndrome (Tr. at 383).  He indicated that he stopped working in November 2008, when he was laid off, and became disabled as of November 15, 2010, when he underwent surgery.  (Tr. at 383.)  He reported past work as a window installer from 1998 to 2008.  (Tr. at 384.)

In a function report, plaintiff indicated that he had about 23% use of his right arm; he could not lift more than 5-10 pounds and had no feeling in it.  He also had a plate in his neck, which limited his range of motion.  (Tr. at 393.)  In a physical activities addendum, plaintiff indicated that he could continuously sit for 10-15 minutes, stand for 30 minutes, and walk for ½ block; in a day, he could sit for 45-60 minutes, stand for one hour, and walk for 10 minutes. Dr. More-O'Ferrall had imposed a lifting limit of 10 pounds.  (Tr. at 401.)

**B.     Agency Review**

The agency denied the application initially on May 8, 2012 (Tr. at 198, 255), based on the review of Syd Foster, D.O., who concluded that plaintiff could perform light work with occasional use of the right arm for overhead reaching and the right hand for fingering and handling.  (Tr. at 206-07.)  Plaintiff sought reconsideration, but the agency maintained the denial on October 31, 2012 (Tr. at 227, 260), based on the review of Mina Khorshidi, M.D., who agreed with the previous assessment (Tr. at 221-22).  Plaintiff then requested a hearing before an ALJ.

Prior to the hearing, plaintiff submitted a work activity report, in which he indicated that in March 2013 he began working six hours per night every other Monday night as a bartender. He reported that Mondays were very slow; he basically served drinks and did not lift cases or ice bags. (Tr. at 454.) He indicated that he also worked the final two hours of a couple of Thursday shifts so another bartender could get to his bowling league on time, helped another bartender learn to close the bar a couple nights by working the final hour with her on those nights, and also worked for a few hours for a special event one Sunday. (Tr. at 457.)

Plaintiff also submitted a March 12, 2013 report from Dr. More-O'Ferrall, who indicated that plaintiff could lift no more than 10 pounds, stand no more than two hours in an eight hour day, and sit no more than two hours in an eight hour day. (Tr. at 1090.) Dr. More-O'Ferrall further indicated that plaintiff could never look down, rarely turn his head, and rarely look up, and could rarely use his right upper extremity for grasping, fingering, or reaching. He estimated that plaintiff would be absent more than three days per month due to his impairments. (Tr. at 1091.) He further indicated that plaintiff had a number of mental limitations, including low tolerance for frustration, difficulty with impulse control, and difficulty maintaining concentration. He estimated that plaintiff could participate in work/work readiness activities for just one to two hours per day. (Tr. at 1092.)[3]

**C.     First ALJ Hearing**

On February 5, 2014, plaintiff appeared for his hearing before the ALJ. The ALJ also summoned a vocational expert ("VE"). (Tr. at 58.)

Plaintiff testified that he was then 40 years old, six feet tall, and 260 pounds. (Tr. at 66.)

---

[3]In May 2015, Dr. More-O'Ferrall prepared an additional report setting forth similar restrictions. (Tr. at 1248-56.)

He lived with his father, a friend, and his 12 year-old daughter. (Tr. at 67.) He had not graduated from high school, nor did he have a GED. (Tr. at 67-68.) He indicated that he had worked since November 15, 2010, the alleged onset date, at Scuttlebutt's Sports Lounge, "watch[ing] the bar for two hours a day here and there. It's a friend's bar." (Tr. at 68.) He did not work regular hours and was not even considered an employee. On average, he worked two days per week, sometimes three. (Tr. at 69.) He testified that the bar rarely had customers during the hours he worked – between 11 a.m. and 2:00 p.m. (Tr. at 84-85.) He was able to alternate sitting and standing while he worked, and he did not do any lifting or stocking. (Tr. at 85.) Plaintiff also did some work for his uncle on two occasions, helping install windows. (Tr. at 69-70.) Prior to the alleged onset date, he worked installing windows and doors. (Tr. at 70-71.)

Plaintiff testified that on November 15, 2010, he underwent cervical fusion surgery following a neck injury 10-12 years earlier. (Tr. at 71-72.) He indicated that physical therapy helped for quite a while, but he eventually started losing feeling in his hands, dropping things, and losing use of both arms, necessitating the surgery. He testified that following the surgery he continued to have limited range of motion, pain in his neck, and occipital nerve damage, causing frequent headaches. His left arm did get better, but his right arm was considerably worse, weaker and number. He underwent physical therapy after the surgery, but it did not help. He also twice attempted to have a spinal cord stimulator implanted (on both occasions it had to be removed due to complications, and he did not want to try a third time) and received frequent facet injections and occipital nerve blocks. (Tr. at 72, 77.) He also took a variety of medications, including Oxycodone. (Tr. at 73-74.) The medications did not help the pain. (Tr. at 76.)

4

Plaintiff further testified that he had recently undergone two surgeries on his left knee, one in October 2013 and the other shortly before the hearing (at which he appeared on crutches). (Tr. at 76, 80.) His medication dosage was increased after the second surgery. (Tr. at 76.) He denied that he had ever gone off his pain medication.[4] (Tr. at 77.) He indicated that he periodically used a cane prior to his knee surgery. (Tr. at 80.)

Plaintiff testified that he performed limited household chores, e.g., vacuuming his room, making his bed once per week, occasionally cooking. He went grocery shopping once per month. (Tr. at 82.) He did not attend his daughter's school functions and did little with her at home.[5] (Tr. at 83.)

Plaintiff testified that his ability to sit varied day to day; he could stand for 20-30 minutes and walk about 4-½ blocks. (Tr. at 86.) He spent a lot of time lying down. (Tr. at 86, 90.) He could lift 10-15 pounds off the ground, 25 from a table. (Tr. at 87.) Plaintiff denied that he helped his father around the house, saying it was the other way around. (Tr. at 87-88.)

Plaintiff also reported having "freeze" headaches from the occipital nerve. (Tr. at 90.) He further reported memory problems based on a combination of pain and medications. (Tr. at 91.) His right arm symptoms included severe pain in the elbow and numbness from the elbow down. He also had a lack of strength and dropped things. (Tr. at 92.)

The VE classified plaintiff's past work as a window installer and maintenance carpenter

---

[4]The ALJ noted that the record contained evidence of drug tests negative for Oxycodone. Plaintiff said the tests should have been positive because he was taking the medication. (Tr. at 94.) He further stated the testing facility was "a shaky place." (Tr. at 95.)

[5]The ALJ asked plaintiff about a notation in the record that he injured his neck diving into a pool over Memorial Day weekend 2012. Plaintiff explained that he was not diving; he was teaching his daughter to dive when he dropped her and she landed on his head. (Tr. at 85; see also Tr. at 922, medical record discussing this incident.)

5

as medium under the Dictionary of Occupational Titles ("DOT"), but very heavy as performed. (Tr. at 96.) The ALJ then asked a hypothetical question, assuming a person capable of light work, with no exposure to hazards. (Tr. at 96.) Those restrictions would rule out the past work, but the person could do other jobs including mail clerk, parking lot attendant, and office helper. (Tr. at 97.)

D.     **First ALJ Decision and Appeals Council Review**

On March 25, 2014, the ALJ issued an unfavorable decision. (Tr. at 228.) The ALJ determined that plaintiff suffered from a number of severe impairments (Tr. at 233), but that he nevertheless remained able to perform a range of light work (Tr. at 236). In so concluding, the ALJ partially credited the reports of the agency medical consultants but said nothing about Dr. More-O'Ferrall's opinions. (Tr. at 238-39.) Relying on the VE's testimony, the ALJ concluded that plaintiff could perform a number of jobs and therefore was not disabled. (Tr. at 240-41.) On June 26, 2015, the Appeals Council granted plaintiff's request for review, vacating the decision and remanding for a new hearing based on the ALJ's failure to discuss Dr. More-O'Ferrall's reports. (Tr. at 250-51.)

E.     **Second ALJ Hearing**

On November 19, 2015, plaintiff appeared for his hearing on remand. The ALJ again summoned a VE. (Tr. at 112.)

Plaintiff testified that he was then 42 years old, six feet tall, and 266 pounds. He indicated that he wrote with his left hand but did most other things with his right. (Tr. at 122.) He lived with his father, 14 year-old daughter, and a friend. His current sources of income were W2 benefits and food stamps. (Tr. at 124.) He had a driver's license and drove daily, usually short trips. (Tr. at 125.) He indicated that, after filing his application, he bartended for

6

about a year, every other Monday night for four or five hours. (Tr. at 127.) Prior to the onset date, he worked installing windows (Tr. at 128), which required him to lift 40 to 60 pounds (Tr. at 131).

Plaintiff testified to physical impairments in his cervical spine, lumbar spine, and left knee. (Tr. at 132-37.) His weight also affected his ability to function. (Tr. at 138.) The neck impairment caused radiating pain and numbness in his right arm. (Tr. at 146.) He explained that his right hand felt like "dead weight." (Tr. at 184.) It was moveable and controllable but constantly felt like he "slapped concrete." (Tr. at 184.) Steering a car with his right hand was difficult, and he sold his motorcycle because he could not handle it. (Tr. at 184.) He indicated that his right arm had one-third the strength of his left. He could grab a garbage bag but would tear his fingers through it so he did not drop it. He could not repetitively grasp objects with his right hand. (Tr. at 185.) He further indicated that he would probably cut himself without noticing it due to the numbness. (Tr. at 186.) At home, he tended to his own room but otherwise did no housekeeping; he did not cook, garden, mow the lawn, or do laundry. (Tr. at 168-69.) He did not go to church or the movies and had not been fishing in years. (Tr. at 169.) He spent the majority of his time in his room in bed. (Tr. at 187-88.)[6]

The VE identified plaintiff's past work as glass installer, medium under the DOT, heavy as performed. The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to sedentary work, with no exposure to dangerous moving machinery or concentrated pulmonary irritants, and occasional ability to climb stairs and

---

[6]The ALJ again asked plaintiff about notations in the record to his prescribed Oxycodone not showing up on drug screens. (Tr. at 157-58.) Plaintiff said the provider never raised this with him. (Tr. at 159.) He also testified that he had never received a warning or been kicked out of pain management. (Tr. at 161.)

7

ramps, stoop, kneel, crouch, crawl, and reach or lift overhead with the right arm. (Tr. at 190.) The VE responded that such a person could not perform plaintiff's past work but could do other jobs, such as bench assembler, inspector/checker, and hand packer. (Tr. at 191.) The VE testified that "these are jobs that are basically using your hands." (Tr. at 193.) If the person were limited to occasional handling and fingering with the right hand, no work could be done at the sedentary level. (Tr. at 195.)

**F.     Second ALJ Decision**

On March 16, 2016, the ALJ issued an unfavorable decision. (Tr. at 23.) The ALJ determined that plaintiff had not engaged in substantial gainful activity since December 5, 2011, the application date. While plaintiff worked as a bartender after the application date, his earnings were negligible. (Tr. at 28.) The ALJ then found that plaintiff had a number of severe impairments, including degenerative disc and joint disease in the spine, left knee disorder, and obesity. The ALJ noted that plaintiff had been diagnosed with carpal tunnel syndrome but found that this impairment did not result in significant ongoing functional limitations. (Tr. at 28.) None of these impairments qualified as conclusively disabling under the agency's regulations. (Tr. at 29-31.)

The ALJ then determined that plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except no work around dangerous moving machinery, no exposure to concentrated pulmonary irritants, and the occasional ability to climb stairs and ramps, stoop, kneel, crouch, crawl, and reach/lift overhead with the right arm. (Tr. at 31.) In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 32.)

In evaluating plaintiff's statements, the ALJ acknowledged the required two-step

8

process, under which he had to first determine whether plaintiff suffered from an impairment that could reasonably be expected to cause the symptoms alleged. Second, once such an impairment had been shown, he had to evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limited plaintiff's functioning. (Tr. at 32.)

Plaintiff alleged in the disability report accompanying his application that his ability to work was limited by cervical radiculopathy syndrome and cervical post-laminectomy residuals. He reported that he stopped working in 2008 for reasons unrelated to his health but became unable to work in November 2010 because of his impairments. In a function report, plaintiff stated that he had 23% use of his right arm and could not lift more than 5-10 pounds; he further reported that he could sit for only 45-60 minutes, stand for one hour, and walk for 10 minutes over the course of a day. At the initial hearing, plaintiff testified that his right arm and neck conditions had been getting worse, with this right arm numb from elbow to fingers. He stated that his 2010 cervical surgery did not help his symptoms. He reported that he had undergone a second left knee surgery and presented using crutches. He related experiencing headaches, which he attributed to right side muscle spasm. (Tr. at 32.) He testified that medications offered only marginal relief, with various side effects. (Tr. at 32-33.) Finally, at the second hearing, plaintiff testified that his physical limitations were related to neck and back pain, left knee residuals, and obesity. He reported radiating pain in his right arm that reduced its functional use by two-thirds as compared to his left arm. He indicated that his right arm felt like "dead weight." He no longer pursued any hobbies or participated in any recreational activities. (Tr. at 33.)

The ALJ concluded that plaintiff's impairments could reasonably be expected to cause

9

the alleged symptoms. However, plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. at 33.)

The ALJ noted that the matter had been remanded to further address the opinions of Dr. More-O'Ferrall, who completed a report in March 2013 stating that plaintiff was unable to work more than one to two hours per day and would require more than three absences per month due to persistent pain relating to cervical radiculopathy, cervical spondylosis, occipital neuralgia, and bipolar disorder. He further stated that plaintiff would never be able to flex his neck to look downward and could rarely look up, turn his head left or right, twist, stoop, crouch or climb. (Tr. at 35, citing Tr. at 1089-93.)[7] The ALJ gave:

> little weight to his conclusory opinions, as they are inconsistent with contemporaneous ongoing outpatient treatment records, clinical findings, hospital reports, and his own treatment records as well as the records of numerous other treating sources. Furthermore, Dr. More-O'Farrell has no demonstrated expertise to support opinions of mental conditions as contributory to his disability.

(Tr. at 35.)

The ALJ then reviewed the medical evidence, noting that plaintiff underwent an anterior cervical fusion at C5-C7 in November 2010. A post-operative hardware infection and blood clots in his leg resolved, and he terminated physical therapy unilaterally in January 2011. (Tr. at 35, citing Tr. at 727-48.) A CT scan in July 2011 demonstrated a solid fusion with no stenosis. (Tr. at 35, citing Tr. at 608.) Plaintiff injured himself while diving into a pool over Memorial Day weekend 2012, and he presented with complaints of neck pain and bilateral arm

---

[7]In his May 2015 report, Dr. More-O'Ferrall added low back pain as a disabling condition but otherwise repeated the same restrictions. (Tr. at 35, citing Tr. at 1248-56.) At that time, he indicated plaintiff could engage in work activities 1-3 hours per day. (Tr. at 1255.)

10

pain and numbness. A cervical MRI in June 2012 showed normal alignment of the fusion site with mild degeneration above and below the fusion levels. The appearance was noted to be similar to the July 2011 scan. (Tr. at 35-36, citing Tr. at 619-20.) Plaintiff continued to be seen for pain management for radicular right-sided neck pain and right upper extremity numbness. A further cervical MRI performed in December 2012 showed no complicating process at the fusion site, although a small right paracentral disc protrusion at C4-5 was noted. (Tr. at 36, citing Tr. at 1085-86.) Right side pain symptoms to his neck and arms continued to be reported, although plaintiff admitted to improvement in daily activities in May 2013. (Tr. at 36.)

Plaintiff testified that he was first diagnosed with lumbar disc disease in 2012-13, but that the focus was originally on his neck because of his past cervical fusion. A thoracic MRI in December 2012 showed mild disc herniation at T8-9. Lumbar x-rays in August 2013 demonstrated normal disc spaces, with no degenerative changes noted. A Dr. Sean Nolan examined plaintiff around that time and found no evidence of musculature or neurological deficits. (Tr. at 36, citing Tr. at 1087-88, 1009.) The record contained subsequent reports of occasional lumbar tenderness, however, examinations in 2013 and 2014 showed negative straight leg raise, good range of motion, and normal gait.[8] He was seen in November 2014 with a new complaint of fatigue and weakness, however, a physical exam showed his neck to be supple (contrary to Dr. More-O'Ferrall's statement that he could never flex his neck) and he had full range of motion throughout. (Tr. at 36, citing Tr. at 1453.)

A Dr. Brian Maloney saw plaintiff in February 2015 for esophageal spasm and noted no

---

[8]In support of this finding, the ALJ cited four exhibits, which total over 100 pages, without pinpoints. (Tr. at 36, citing Ex. 26F [1119-33], 22F [1014-88], 28F [1181-222], 35F [1311-60].)

11

musculoskeletal or neurological problems. (Tr. at 36, citing Tr. at 1240-47.) The ALJ then stated: "There is nothing in the record to substantiate [plaintiff's] testimony of his right arm as 'dead weight.'" (Tr. at 36.) A lumbar MRI in August 2015 showed a mild disc bulge at L4-5 and very minimal disc bulge at L3-4; the imaging was otherwise unremarkable. (Tr. at 36, citing Ex. 35F.)

The ALJ concluded: "As stated above, Dr. More-O'Farrell's form reports opining an inability to work more than 1-3 hours a day and never be able to flex his neck to look downward are contrary to the findings of numerous treating sources as well as [plaintiff's] demonstrated work history." (Tr. at 36.)

Regarding plaintiff's left knee impairment, a July 2012 MRI showed a possible thin meniscus tear. (Tr. at 36, citing Tr. at 1229.) An arthroscopic procedure in October 2012 showed no problems with the meniscus and a limited synovectomy was performed. (Tr. at 36, citing Tr. at 1002.) Plaintiff reported one week post-op that he had no significant pain and was getting better each day. (Tr. at 36, citing Tr. at 1223.) Plaintiff was asymptomatic until renewed complaints of left knee pain were reported in December 2013. (Tr. at 36, citing Tr. at 1205.) A left knee arthroscopy with partial medial meniscectomy was performed in February 2014, without complication. Follow-up exams documented occasional tenderness but generally good range of motion, no neurological deficits, and normal gait. Plaintiff testified at the second hearing that his left knee was "pretty well under control" and his right knee was "fine." (Tr. at 36, citing Ex. 38F [1376-1470] and 35F [1311-60].)

The ALJ found plaintiff's statements "to be partially credible." (Tr. at 37.) The ALJ noted several contradictions between plaintiff's hearing testimony and either the records or his previous reports. First, while plaintiff testified to occasionally working two hours bartending at

12

a sports lounge during the day when the bar was near empty, he reported to the agency that he worked six hours every other Monday night. (Tr. at 37, citing Tr. at 454.) Second, while plaintiff claimed that he could not take care of his personal needs, get out of his house, or do basic chores, the record showed that he rolled out roofing, pressure washed his home, did roofing up north, attended athletic events with friends, and dove into and went swimming in a pool. (Tr. at 37, citing Ex. 6F, 2F, 15F, 9F.) Third, plaintiff testified that he had been prescribed a cane to assist in ambulation, but the record did not support this statement. Fourth, the ALJ noted multiple negative tests for Oxycodone, despite plaintiff's testimony that he took the medication as prescribed. (Tr. at 37, citing Ex. 10F). The ALJ found unpersuasive plaintiff's testimony that the testing facility was somehow mistaken or substandard. This failure to take pain medication as prescribed suggested that plaintiff's symptoms had not been as severe as claimed. (Tr. at 37.)

The ALJ concluded:

The evidence supports the assessed limitation to sedentary exertional level work with the further restrictions as set forth in the RFC determination. As stated above, the evidence shows him working with roofing materials, pressure washing his house and taking part in physical activities with his daughter. He stopped working in 2008 for reasons unrelated to his impairments (Exhibit 2E). He continues to maintain a variety of activities of daily living. There is no evidence to support his recent characterization of his right arm as "dead weight"; however, the undersigned has limited overhead reaching with this extremity to accommodate his reports of intermittent radicular symptoms. State agency consultants, Dr. Syd Foster, DO, and Dr. Mina Khorshidi, MD, opined that [plaintiff] remained capable of performing work at the light exertional level (Exhibits 2A and 3A). While their opinions have support in the limited objective findings of record, the undersigned limits [plaintiff] to sedentary work in order to provide every reasonable consideration to his subjective complaints. The occasional right-handed fingering and handling limitations posited by Drs. Foster and Khorshidi in Exhibits 2A and 3A are not supported in the longitudinal record, which shows no more than mild handling or fingering issues with the right hand. Moreover, ongoing examinations of the extremities and neurological assessments have generally been normal.

13

(Tr. at 37-38.)

Based on this RFC, the ALJ determined that plaintiff could not perform his past relevant work as a glass installer, which exceeded the sedentary level. (Tr. at 38.) However, he could perform other jobs, as identified by the VE. The ALJ accordingly found plaintiff not disabled. (Tr. at 39.)

On May 16, 2017, the Appeals Council denied review (Tr. at 1), making the ALJ's decision the final word from the agency on plaintiff's application. See Moreno v. Berryhill, 882 F.3d 722, 728 (7th Cir. 2018). This action followed.

## II. DISCUSSION

### A. Standards of Review

The court will uphold an ALJ's decision if it is supported by "substantial evidence," meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review. Scrogham v. Colvin, 765 F.3d 685, 695 (7th Cir. 2014). If the decision lacks an adequate discussion of the issues, it will be remanded. Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009). Under the so-called Chenery doctrine, the court's "review is confined to the rationales offered by the ALJ," Shauger v. Astrue, 675 F.3d 690, 695 (7th Cir. 2012) (citing SEC v. Chenery Corp., 318 U.S. 80, 93-95 (1943)), "and the agency may not bolster the ruling with evidence the ALJ did not rely on." Id. at 697.

In reaching his decision, the ALJ must consider all medical opinions in the record. Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013). A treating physician's opinion on the nature and severity of the claimant's medical condition is entitled to "controlling weight" if it is

14

well supported by medical findings and not inconsistent with other evidence in the record. Gerstner v. Berryhill, 879 F.3d 257, 261 (7th Cir. 2018).[9] If the ALJ declines to give controlling weight to a treating physician's opinion, he may not simply to discard it. Rather, the ALJ must then decide how much weight to give the opinion, considering the length, nature, and extent of the treatment relationship; the extent to which the opinion is supported by relevant evidence; the consistency of the opinion with the record as a whole; and whether the treating physician is a specialist in the relevant area. Scrogham, 765 F.3d at 697. The ALJ must always offer "good reasons" for discounting the opinion of a treating physician. Israel v. Colvin, 840 F.3d 432, 437 (7th Cir. 2016). The ALJ is also required to evaluate the opinions of non-examining agency medical consultants, considering the expert's medical specialty and expertise, the support for the opinion in the evidence of record, and the explanation offered for the opinion. Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005).

The ALJ is further required to consider the claimant's statements regarding his symptoms and their effect on his ability to work. In evaluating a claimant's statements, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5; SSR 96-7p, 1996 SSR LEXIS 4, at *5. If the claimant has such an impairment, the ALJ must then evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. SSR 16-3p, 2016 SSR LEXIS 4, at *9; SSR 96-7p, 1996 SSR LEXIS 4, at *5-6. At this second step, "the absence of objective medical corroboration for a complainant's subjective accounts of pain does not permit an ALJ to

---

[9]This is the rule governing claims filed before March 27, 2017. Id.

disregard those accounts." Ghiselli v. Colvin, 837 F.3d 771, 777 (7th Cir. 2016). Rather, once the claimant has demonstrated the existence of an impairment that could reasonably be expected to produce the symptoms, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms based on the entire record, considering the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; other treatment or measures the claimant receives or uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *18-19; SSR 96-7p, 1996 SSR LEXIS 4, at *8.[10] The ALJ must then provide specific reasons for his credibility determination, supported by substantial evidence in the record. Israel, 840 F.3d at 441. The reviewing court will overturn an ALJ's adverse credibility finding if it is "patently wrong." Gerstner, 879 F.3d at 264.

**B.    Plaintiff's Arguments**

In his reports and testimony, plaintiff alleged significant limitation in his ability to use his right arm and hand for lifting and handling objects. (Tr. at 72, 92, 146, 184-86, 393.) The medical opinion evidence supports his claim, with the agency consultants limiting plaintiff to occasional use of the right arm for overhead reaching and the right hand for fingering and

---

[10]SSR 16-3p went into effect on March 28, 2016, shortly after the ALJ issued his decision in this case, replacing SSR 96-7p. The new Ruling eliminates use of the term "credibility" and clarifies that "subjective symptom evaluation is not an examination of an individual's character." 2016 SSR LEXIS 4, at *1; see also Cole v. Colvin, 831 F.3d 411, 412 (7th Cir. 2016) (explaining that this change in wording was meant to clarify that ALJs are not in the business of impeaching claimants' character but will continue to assess the credibility of pain assertions by claimants). SSR 16-3p requires use of the same two-step test and consideration of the same factors at SSR 96-7p.

16

handling (Tr. at 206-07, 221-22) and Dr. More-O'Ferrall finding that plaintiff could rarely use his right upper extremity for grasping, fingering, or reaching (Tr. at 1091, 1254).

The ALJ included a limitation on overhead reaching with the right arm to accommodate plaintiff's reports of intermittent radicular symptoms, but he found no evidence to support plaintiff's characterization of his right arm as "dead weight." (Tr. at 37.) As plaintiff notes in his brief, the "dead weight" characterization should not be taken literally. As part of this exchange with the ALJ, plaintiff explained that he had some use of the right arm and hand, albeit limited. He specifically explained that while he could grab things he could not do so repetitively. (Tr. at 185.)

The ALJ rejected the agency consultants' right-handed fingering and handling limitations as unsupported by the longitudinal record, which showed no more than mild handling or fingering issues with the right hand, and the ongoing examinations of the extremities and neurological assessments, which had generally been normal. (Tr. at 37-38.) The ALJ did not cite any record evidence in support of this finding, and his previous discussion of the medical evidence contains no obvious support.[11] The ALJ cited a July 2011 CT myelogram, which demonstrated a solid fusion and no stenosis; a June 2012 cervical MRI, which showed normal alignment of the fusion site with minimal degeneration; and a further cervical MRI from December 2012, which showed no complicating process at the fusion site. (Tr. at 35-36.) The

---

[11]While the court may not affirm based on evidence the ALJ did not cite, the court does read the decision "as a whole to ascertain whether [the ALJ] considered all of the relevant evidence, made the required determinations, and gave supporting reasons for his decisions." Orlando v. Heckler, 776 F.2d 209, 213 (7th Cir. 1985).

17

ALJ did not explain how these scans relate to plaintiff's claimed manipulative limitations.[12] The record does contain an EMG study, which showed right C6-7 radiculopathy and right median neuropathy at the wrist consistent with mild carpal tunnel syndrome (Tr. at 670); physical exams showing diminished strength on the right (Tr. at 730, 1016, 1023); and reports of loss of grip strength, pain, numbness, and weakness on the right (Tr. at 645, 751, 1014, 1022), evidence the ALJ did not specifically discuss. The ALJ noted normal musculoskeletal and neurological exams by Drs. Nolan and Moloney (Tr. at 36), but those doctors saw plaintiff for shortness of breath and esophogeal spasm (Tr. at 1007, 1242-43), so it is hard to see how their findings support the ALJ's conclusion.[13] The ALJ also cited plaintiff's August 2015 lumbar MRI – immediately after rejecting plaintiff's "dead weight" comment (Tr. at 36) – but it is again unclear how this evidence relates to plaintiff's right arm.

Finally, the ALJ discounted Dr. More-O'Ferrall's opinion regarding plaintiff's ability to maintain work activities and move his neck as inconsistent with the medical evidence and plaintiff's work history, but he did not specifically discuss the treating doctor's manipulative limitations.[14] (Tr. at 35, 36.) The Commissioner acknowledges that the ALJ did not specifically discuss Dr. More-O'Ferrall's opinion regarding plaintiff's manipulative limitations but contends that the ALJ reasonably gave little weight to the doctor's opinion as a whole. (Def.'s Br. at 7.)

---

[12]In discussing credibility, the ALJ cited evidence that plaintiff was able to move his neck and engage in part-time work and other activities, but he did not explain how this evidence undercut the claimed manipulative limitations.

[13]The ALJ did cite a note from November 2014, when plaintiff was seen for fatigue and muscle weakness (Tr. at 1451), in which a physician's assistant reported normal range of motion (Tr. at 1453). It is also hard to see how this lone exam supports the ALJ's finding.

[14]Nor did he discuss Dr. More-O'Ferrall's right upper extremity examination findings. (E.g., Tr. at 1014-16, 1022-23.)

18

However, an "ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report." Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009) (internal citations and quote marks omitted). The Commissioner further argues that any error was harmless, as the ALJ rejected the agency consultants' even less restrictive manipulations. (Def.'s Br. at 7.) As indicated above, however, the ALJ's consideration of those reports was also flawed.

The VE testified that a limitation to occasional handling and fingering would eliminate work at the sedentary level. (Tr. at 195.) It is important that the ALJ fully consider the evidence of such limitations in this case. The matter will be remanded for this purpose.[15]

---

[15] Plaintiff argues that the ALJ, rather than evaluating the intensity, persistence, and limiting effects of his right arm symptoms, impeached his character by focusing on alleged contradictions between his hearing testimony and the record. He further argues that some of the contradictions are not contradictions at all, and that others are due to his terrible memory. It is permissible for an ALJ to consider a claimant's daily activities and part-time employment in evaluating a disability claim, see, e.g., Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008), although this must be done with care, see, e.g., Roddy, 705 F.3d at 639. Plaintiff may on remand explain to the ALJ that he did not regularly attend sporting events; that roofing work and pressure washing his house were atypical activities for him, which caused his symptoms to flare; that the drug testing discrepancy may relate to the fact that the tests were done by his mental health provider, not his pain management provider; and that he used a cane to deal with his knee problem, likely on the recommendation of his knee surgeon, Dr. Berry, whose records may be incomplete. He may also remind the ALJ of his explanation about the Memorial Day diving incident and that he bartended only when the tavern was not busy. The ALJ should consider these explanations and must keep in mind that a person's ability to perform certain daily activities, especially if that can be done only with significant limitations, does not necessarily translate to an ability to work full-time. Ghiselli, 837 F.3d at 778; see also Lanigan v. Berryhill, 865 F.3d 558, 565 (7th Cir. 2017) (noting that ALJ should have considered part-time employer's generosity and tolerance). He should also explain how these activities undercut plaintiff's specific claims of manipulative limitations. See, e.g., Lang v. Berryhill, No. 16-C-602, 2017 U.S. Dist. LEXIS 65933, at *63 (E.D. Wis. Apr. 29, 2017) (remanding where the ALJ did not link any of the clamant's activities with her specific claims regarding her limitations).

19

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 11th day of June, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge